**In re Paul D. BECHTELHEIMER,
Nelda K. Bechtelheimer,
Debtors.**

**Bankruptcy No. 96–02352–8G3.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

July 27, 1999.

Richard B. Feinberg, Patrick R. Smith, Feinberg, Isaak & Smith, P.A., Tampa, Florida, for debtors.

B. Gray Gibbs, Gibbs & Runyan, P.A., St. Petersburg, Florida, for debtors.

John A. Galotto, Trial Attorney, Tax Division, United States Department of Justice, Washington, D.C., for the United States of America.

Charles R. Wilson, United States Attorney, Tampa, Florida, for the United States of America.

Terry E. Smith, Bradenton, Florida, trustee.

## ORDER OVERRULING OBJECTION TO THE CLAIM OF DEPARTMENT OF TREASURY—INTERNAL REVENUE SERVICE

PAUL M. GLENN, Bankruptcy Judge.

**THIS CASE** came on for hearing on Objection to the Claim of Department of Treasury—Internal Revenue Service filed by Paul D. and Nelda K. Bechtelheimer (the "Debtors") and the Response to Debtors' Objection to Claim filed by the United States of America. The Internal Revenue Service ("IRS") filed an amended proof of claim in the amount of $48,387.23 for unpaid taxes and penalties assessed against the Debtors (Claim No. 18). The claim is both a priority and general unsecured claim. The Debtors object to the claim, specifically because the claim arises from the disallowance of certain income tax deductions for the tax years 1991, 1992, 1993, and 1994.

### Background

Paul Bechtelheimer was born in 1935 and raised in Sebetha, Kansas. He met his wife, Nelda, there, and they were married there in 1957. He lived most of his early adult life in Kansas, driving a truck, working in a warehouse in Topeka, working in insurance in Manhattan, working in a bank in Kansas City, and working for a small manufacturing company in Shawnee. He then "tried to make things go" in Florida and "they didn't work," moved to St. Louis, "worked for a company out of Oklahoma for a couple of years," "went back to my original company in Kansas City, ending my employment there in early '88, and at that point in time, we went on the road full time." (Transcript pp. 13, 14).

Since early 1988, the Debtors have been self-employed as artists or crafters. They purchase or cast plaster items, paint them, and sell them at arts and crafts shows. "These pieces are lamps and figurines in the Southwestern motif. We also decorate baskets in the Southwestern theme and we also cut wood in the Southwestern theme." They sell these products "at arts and craft shows where we feel that the market may be conducive to our products." (T. 15). "During the winter months, we do come to Florida normally for about six months, try to anyhow; and then the rest of the time, we're traveling over the country selling our wares." (T. 15). During the years in question, the Debtors traveled to approximately 40 shows a year. (T. 16). Typically, the length of the shows ranged from two to ten days. The shows were held at convention centers, outdoor festivals, and malls. During the tax years in question, the Debtors traveled to shows in Florida,

Pennsylvania, New York, Maryland, New Jersey, Ohio, Missouri, and Colorado. (T. 18). Mr. Bechtelheimer recalls that they attended more shows in Florida than in any other state. (T. 19).

In 1989, the Debtors acquired a Pace Arrow motor home. They traveled to the arts and crafts shows in the motor home, and lived in the motor home while participating in the shows. (T. 22). The motor home was 38 feet in length, had a dining area, a kitchen area, a bathroom, and a bedroom. Inside the motor home was a refrigerator, a stove, a microwave, a washer, a dryer, two television sets, a couch, a chair, and a bed. The motor home was heated by propane furnaces attached to the motor home, was air conditioned, received electricity from a generator on the motor home that was powered by gas on the motor home, and had running water from a reservoir tank and battery powered pump that were attached to the motor home. A trailer attached to the motor home was used for storage of their inventory. The motor home was the Debtors' only means of transportation during the years in question after they disposed of their automobile in December, 1992. The Debtors lived and slept in their motor home while attending craft shows and while traveling between craft shows.

Also in 1989, the Bechtelheimers sold their home in Gardner, Kansas.

In early 1990, approximately six months after selling their home in Kansas (T. 23), and after acquiring the Pace Arrow motor home, the Bechtelheimers bought a mobile home and lot at 9101 Kosimo Street, New Port Richey, Florida (the Kosimo property). The mobile home was on blocks, had attached porches in the front and rear, an outbuilding with a washer and dryer, electricity, a pump for water, and a septic tank. The mobile home had a living room, a kitchen-dining area, two bedrooms, and one and one-half bathrooms. The mobile home contained a kitchen table and chairs, a refrigerator and stove, a television, and "it had a mattress on the floor." The

Debtors obtained a homestead tax exemption for their mobile home and lot. Mr. Bechtelheimer testified that since the value of the mobile home and lot was less than $25,000, the maximum amount of the homestead tax exemption, they did not pay any property taxes. Also, as Mr. Bechtelheimer explained, "We applied for homestead ... which means you have to register to vote in that county, have a Florida driver's license, and tag your vehicles there." The Debtors also claimed the mobile home and lot as their homestead on the schedule of exemptions which they filed with their petition.

When the Debtors were at the ·Kosimo property, however, they parked their motor home in the driveway, connected the motor home to an outdoor electrical outlet, and used the motor home for sleeping. Mr. Bechtelheimer testified that during the tax years in question, when the Debtors were at the Kosimo property, they ate and worked in the mobile home, using it to mold and paint their crafts. They also used it to store their crafts and overstock. (T. 56). "It could have been habitable. We just didn't desire to use it for that." (T. 53). "We used it as a shop, and had we gone in there and cleaned out all the molds and everything, there was no reason in the world why it couldn't have been habitable." (T. 53). In a letter dated April 15, 1996, from the Debtor's accountant to the IRS relating to "1992 Audit Review Information," the following statement signed by the Debtor was included:

Inventory Storage expense. (no deduction taken for this)

House: (2 Bedroom Mobile home) (1969) The house is used for storage as we have no furniture, with the exception of an old kitchen table, misc. folding chairs, gas stove, no LP tank on premises, + a refrigerator that is disconnected. otherwise the house is storage.

The kitchen, dining area + living room area are used for casting some of our products that we sell. This area is also used for drying these castings. The 2 Bedrooms are used for storage of over-

stock on white ware, Lampshades Misc. Baskets, Christmas Items that will be pulled in November for resale. The front porch is used for storage of out of date white ware + misc. display cases, racks, crates etc. all of which is used occasionally, then returned to the storage area. The house is in need of extensive remodeling because of its age, see photos. We do keep a telephone there for business + personal use when there. When at the house we continue to live in the motor home.

Mr. Bechtelheimer testified that although this letter was written to support his positions in the audit of tax years in question, it contained some mistakes and described the property as it was in 1996 rather than as it was in 1991 through 1994.

The Bechtelheimers have two children, both of whom were adults and were not living with their parents during the tax years in question, and both of whom live in Kansas. Mr. Bechtelheimer also testified that for approximately six months his son lived at the Kosimo property while he looked unsuccessfully for work, and for approximately another six months his daughter lived at the Kosimo property while she looked unsuccessfully for work. "It was not real comfortable for them, I guess, but it was a place for them to stay."

During the tax years in question, the Bechtelheimers received mail at the Kosimo property address, and also maintained a post office box in Kansas.

The following chart shows, for 1992 by month, the number of days which the Debtors were at the Kosimo property:

| Month | Number of Days at Kosimo Property |
|---|---|
| January | 8 |
| February | 13 |
| March | 3 |
| April | 0 |
| May | 0 |
| June | 0 |
| July | 4 |
| August | 0 |
| September | 3 |
| October | 7 |
| November | 0 |
| December | 0 |
| Total | 38 |

This appears to be typical of the amount of time which the Debtors spent at the Kosimo property during the tax years in question. The Debtors have indicated that they spent 35 to 40 days at the Kosimo property during each of the tax years in question.

It also appears that the Debtors had 247, 240, 248, and 233 actual show days during 1991, 1992, 1993, and 1994, respectively.

The Debtors always traveled together. There was never a time during the four years in question when one of the Debtors stayed at the Kosimo property while the other was away or at a show. (T. 47).

On February 28, 1996, the Debtors filed their Voluntary Petition for Relief pursuant to Chapter 13 of the Bankruptcy Code.

**Discussion**

■ Title 26 U.S.C. § 162(a)(2) provides:

**162. Trade or business expenses.**

(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

. . . . .

(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business.

The only question presented is whether the Kosimo property was the Debtors' home within the meaning of § 162(a)(2), such that the Debtors were "away from home," and thus entitled to the travel expense deduction, while traveling their circuit of arts and crafts shows during the tax years in question.

The United States claims that the Debtors were itinerants whose home traveled

with them, and consequently were not entitled to travel expense deductions pursuant to § 162(a)(2) of the Internal Revenue Code.

The United States District Court for the Western District of Louisiana reviewed the law in *Whitman v. United States*, 248 F.Supp. 845 (W.D.La.1965), dividing the authoritative cases into three categories, (1) commuter cases, in which the taxpayer, for personal reasons, lives in one place and works in another; (2) cases where taxpayers' employment may be located away from their desired residence; and (3) cases where the taxpayer is characterized by the IRS as an itinerant without a permanent or fixed place of abode. *Whitman v. United States* is often cited for the conclusion that with regard to the many decisions interpreting the "away from home" issue "... neither reconciliation nor deduction of a universally applicable rule is possible...." 248 F.Supp. at 850. In *Six v. United States*, 300 F.Supp. 277, 279 (S.D.N.Y.1969), the District Court stated, "It may well be that the reason for the lack of a clear-cut legal definition of 'home' as it is used in 162(a)(2) is that it is not ultimately a legal concept subject to a convenient rule, but is instead a factual matter dependent upon the circumstances of the particular case."

In *Deamer v. Commissioner*, 752 F.2d 337, 339 (8th Cir.1985), the appellate court, concluding that the taxpayer was an itinerant, cited *Michel v. Commissioner*, 629 F.2d 1071, 1073 (5th Cir.1980) for the following discussion: "Implicit in the 'away from home' requirement, however, is the premise that the taxpayer actually has a 'home.' Hence, one who has no principal place of business or a permanent residence is considered an itinerant.... An itinerant may not deduct expenses under this section, because he is never considered to be 'away from home.'"

The location of a taxpayer's home and whether he or she is "away from home" within the meaning of § 162 ordinarily involves a question of fact upon which the taxpayer bears the burden of proof. *Id.* at 1073. See also, *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

The Debtors are hampered in their assertion that the Kosimo property is their home for purposes of § 162 by several facts. Mr. Bechtelheimer testified that they slept in their motor home even when they stayed at the Kosimo property. Whereas their motor home contained appliances, couch, chair, dining area, two television sets, and bed, the Kosimo property contained appliances, a mattress without box spring or frame, and a kitchen table with chairs. When the Bechtelheimer's were at the Kosimo property, they used it to work in at times, but not to live in. It was also used for storage. In his testimony Mr. Bechtelheimer contends that the Kosimo property could have been habitable, but that they just didn't desire to live in it. From the evidence, the Court concludes that the Debtor's motor home was their "home." It appears that the Kosimo property was many things to the Debtors: workshop, storage facility, campsite and mail drop. Mr. Bechtelheimer testified that the Kosimo property was purchased with the idea that one day it could be their retirement home. The Kosimo property could be considered a potential dwelling place for the Debtors. This potential was never realized, however, since the Bechtelheimers sold the Kosimo property in 1997.

In *James v. United States*, 308 F.2d 204 (9th Cir.1962), the Court of Appeals affirmed the lower court's decision that the taxpayer was not entitled to a deduction for meals and lodging while away from Reno, Nevada, in pursuit of trade or business. Mr. James spent 30 days a year in Reno, living in hotels and eating in restaurants during this period; the remainder of the year he was traveling across the Midwest as a clothing salesman, living in hotels and eating in restaurants. The Court stated, "To characterize his expenditures for meals and lodging in Reno as personal

living expense, and his expenditures for meals and lodging elsewhere as travel expense incurred in the pursuit of business, would be essentially arbitrary." 308 F.2d at 208. The Court based its ruling on the theory that only when the taxpayer has a "home," the maintenance of which involves substantial continuing expenses which will be duplicated by the expenditures which the taxpayer must make when required to travel elsewhere for business purposes, may the travel expense deduction be justified. In Footnote 7, the Court continued, "Moreover, the existence of a 'home' sufficiently substantial to make it reasonable to assume that taxpayer would be there by personal preference if not compelled by business to be away provides the only practical guaranty that the travel itself will be undertaken (and hence that on-the-road living expenses will be incurred) only when required by the exigencies of business. A taxpayer with only a nominal 'home' and little incentive to return may remain in a tax-deductible travel status beyond the necessities of the job." 308 F.2d at 207.

■ In connection with the Kosimo property, the Court finds that the Debtors did incur certain some continuous expenses, most notably, mortgage, utility and telephone costs. These expenses do not make the property a "home," however. The Court must determine in connection with these continuing expenses whether the Kosimo property is a home "sufficiently substantial" for the Debtors to reside or merely a "nominal home."

In *Rambo v. Commissioner*, 69 T.C. 920, 1978 WL 3362 (1978), the Tax Court held that petitioner's simple cabin in Montana constituted his "tax home" so that expenses for meals and lodging incurred at various temporary out-of-state work sites were deductible under 162(a)(2) of the Internal Revenue Code. In its decision the Tax Court stated that " ... the details of petitioner's lifestyle and his relatively simple accommodations ought not to control the deductibility of expenses incurred at his various work sites." *Id.* at 925. In

*Rambo,* however, the location of taxpayer's cabin was also his historical home. The Debtors' historical home is in Kansas where their immediate family members reside, they rent a storage unit and they own raw land. In addition, in *Rambo,* the taxpayer lived for a short period of time and commuted daily to work sites in Montana, prior to his extended period of travel to out-of-state work sites.

The Debtors' situation, although unique, has similarities to *Baugh v. Commissioner,* T.C.Memo, 1996–70, 1996 WL 72697 (1996). In that situation, the taxpayers, both nuclear power plant workers, traveled from job to job in their motor home while maintaining a duplex in Port Clinton, Ohio. The Baughs rented both apartments in the duplex for a portion of one of the tax years in question. For the remainder of the tax years in question the Baughs used one of the units in the duplex to store their furniture and rented the other unit. The tax court held that the Baughs did not incur additional and duplicate living expenses and were not entitled to deduct any expenses under § 162(a)(2). The court stated that the Baughs failed to present evidence that they established their home at the property in question. The Kosimo property, in light of all the evidence presented by the Debtors, appears to the Court to be similar to the concept of a "nominal home" as the Ninth Circuit Court of Appeals mentioned in *James,* supra. The continuing expenses incurred by the Debtors do not necessitate a finding by the Court that the Kosimo property was their home. Their personal choice to purchase property in Florida, and to use the property to rest or stop-over for certain days of the year, and thus incur "additional and duplicate" expenses does not establish that the Kosimo property was their home for purposes of § 162(a)(2) of the Internal Revenue Code. See *Kroll v. Commissioner,* 49 T.C. 557, 562, 1968 WL 1461 (1968).

The Debtors cite several cases, including *Charles G. Gustafson,* 3 T.C. 998, 1944 WL 144 (1944), in which the Tax Court held

that Gustafson, a national representative of the Dry Goods Journal, was entitled to deduct the entire amount spent for meals, lodging, and laundry while traveling 52 weeks a year in 1940. However, by 1966, the Tax Court expressed the view that the Gustafson opinion had been "sapped" of "much, if not all, of its vitality." See *Hicks v. Commissioner*, 47 T.C. 71, 74, 1966 WL 1103 (1966). The emphasis had shifted to "such continuing and duplicitous expenses ... to justify the allowance of a deduction for all food and lodging expenses while traveling." *Supra*, at 75. The Tax Court upheld a deduction for travel expenses incurred away from home for two Ice Follies skaters in 1964 (See *Judy L. Gooderham v. Commissioner*, T.C.Memo, 1964–158 and *Patricia A. Ruby Hall v. Commissioner*, T.C.Memo, 1964–157). However, by 1997, under similar facts for a Walt Disney World on Ice stagehand, the Ninth Circuit upheld the disallowance of travel expenses, holding that the worker was an itinerant, and had no tax home as required for the deduction of travel expenses pursuant to 162(a)(2). See *Henderson v. Commissioner*, 143 F.3d 497 (9th Cir.1998).

Although the facts are different in *Whitman*, supra, the District Court analyzed whether the claimed place of abode was actually the taxpayer's regular place of abode. Evidence was offered that taxpayer's driver's license, mailing address, car registration and other indications of permanent residence were maintained at he taxpayer's claimed place of abode. All of these contacts were insufficient to support the contention that the claimed place of abode was a "home" that would justify the deduction for travel expenses away from home. Also see, *Scotten v. Commissioner*, T.C.Memo, 1966–206, 1966 WL 1002 (1966), *aff'd*, 391 F.2d 274 (5th Cir.1968), *Hicks v. Commissioner*, 47 T.C. 71, 73, 1966 WL 1103 (1966) and *Fisher v. Commissioner*, 23 T.C. 218, 1954 WL 330 (1954), *aff'd* 230 F.2d 79 (7th Cir.1956). Even in the circumstances of fee ownership of a claimed place of abode, there has been disallowance of travel expenses incurred away from home. In *Baugh*, supra, the ownership of a duplex (half of which was rented out during the tax years in question), and in *Whitman*, supra, the ownership of a single family residence in which the petitioner's parents resided, were not enough to justify the "substantial and duplicative living expenses" of *James*, supra. In the above two cases, the taxpayers' "homes" were their motor homes that always traveled with them, and not their other real property claimed as their regular places of abode or "homes." In Debtors' case their motor home, where they slept even when they stayed at the Kosimo property, was their home as such term is used in 26 U.S.C. § 162(a)(2). Therefore, the Debtors were itinerants, never away from home, and not entitled to the travel expense deduction.

### Conclusion

"Ultimately, we are convinced that the taxpayer[s'] [motor home] was [their] place of abode in a real and substantial sense, and while [they] resided there [they] were not incurring 'traveling expenses ... while away from home ...' under section 162(a)(2)." *Whitman*, 248 F.Supp. at 850.

Accordingly;

**IT IS ORDERED** that:

1. The Debtors' Objection to Claim of the IRS is overruled.

2. Claim No. 18 of the Internal Revenue Service is allowed as filed in the amount of $48,387.23.